The next matter, number 25-1110, United States ex rel. Omni Healthcare Inc. v. MD Spine Solutions LLC et al. At this time, would counsel for the appellant, OmniCare, please come to the podium and introduce himself on the record to begin. Good morning, your honors, and may it please the court. My name is Evan Bianchi of Spiro, Harrison & Nelson on behalf of appellant OmniHealthcare. May I reserve three minutes for rebuttal? You may. Thank you. Your honors, there are few questions more fact-intensive than determining scienter. For that reason, as this court has recognized, it is unusual to grant summary judgment on scienter, and it was particularly unusual to do so in this case where the only piece of evidence directly revealing the defendant's subjective beliefs showed that they acted with deliberate ignorance and reckless disregard with respect to whether PCR UTI testing was medically necessary between 2018 and 2019. Your honors, it was not Omni's burden to prove scienter at this stage. Instead, all it needed to do was to show that there was a genuine dispute as to defendant scienter that precluded summary judgment, and Omni cleared that bar. Looking at the record, I think the most important piece of evidence in this case is the January 2, 2018, email between MD Labs' co-founders Rutledge and Grizel. January 2, 2018, was the very beginning of the relevant time period when MD Labs had begun rolling out the PCR UTI testing, and in that email exchange, there's three things that really stick out. First is the email that Rutledge sends to Grizel where he identifies PCR UTI technology as new technology. Second, he recognizes the duty that MD Labs has to inform CMS of this new technology. And the third thing that is particularly telling is in Grizel's response, he identifies the need to seek guidance on medical necessity from the applicable Medicare contractor that governed the jurisdiction in which MD Labs was situated. That email exchange shows defendant's subjective beliefs about, A, the fact that there was a risk that PCR UTI testing may not have been medically necessary, and perhaps... I guess I'm not sure that's right. So if I read those emails, and I think you would say that the emails are your best evidence setting out scienter here. Would you agree with that? Your Honor, I think it's the best direct evidence. Direct evidence. Yes. What exactly in those emails shows that Rutledge and... I'm not sure how to pronounce the other... Grizel were aware of substantial risk that the tests were medically unnecessary. Couldn't they really be just a more general desire for guidance about the new testing? Your Honor, I don't think so. I think that what they're doing is pretty clear. They're identifying it as new technology, and I think that that part's important when you consider the context of Medicare. Congress designed Medicare to be a program of restraint. It's not a blank check for every new medical technology. It only pays for services that are reasonable. Well, it's not a blank check, but every new technology isn't necessarily not necessary. Your Honor, that's correct, but here the question on appeal is not whether or not this testing was actually medically necessary or not necessary. The question is, did defendants identify the risk that it might not be necessary and then disregard it? And that's exactly what they did here. They had a reason to do that. Why does that even matter if the medical necessity determination is made by a physician first? Well, Your Honor, the question here is not a patient-specific decision. In a lot of the cases that my friend has cited... I think Judge Montecarlo's question goes right to that. If a doctor says we want this test, why isn't that patient-specific? The physician's decision is patient-specific. The question of medical necessity as to whether categorically PCR-UTI testing is medically necessary is not patient-specific. And so if the doctor orders it, the lab is supposed to, what, step in and say this isn't medically necessary to the doctor? Well, yes, Your Honor, labs have a duty to not provide false claims to Medicare. The labs are the ones who are asking for reimbursement from Medicare for it. And in this case in particular, you had the co-founders of the labs identifying that there might be an issue with medical necessity, and instead of following through on their need to ask for that guidance, they did nothing. They did nothing, and I think there's a reason they did nothing. But you didn't answer the question. The question is they're supposed to contact the doctor and say we don't think this is medically necessary, or are they supposed to process it and not seek reimbursement from Medicare? Well, to step back, Your Honor, I think that the situation is different than in most situations where you might be a lab that offers multiple different types of services for different types of patients. Here, MD Labs was a PCR-UTI testing laboratory. That's the service they offered for UTI testing. They sought out physicians for their service. They had sales representatives who contacted physicians saying you should, you know, submit samples to us so that we can do PCR-UTI testing. Now, there might be a question about whether the doctors also should have known that this was medically unnecessary. That question is not on appeal. What is on appeal is MD Labs' scienter, and, you know, the physicians might have ‑‑ I mean, I think there's some dispute as to whether it's medically unnecessary. Is that an important determination? It is an important determination for the underlying FCA liability. It's not an important determination for the question of scienter, which is on appeal today. But if it is medically necessary, how can that be? Well, Your Honor, what we have to do first is determine whether or not the record shows that there was a risk that it might not be and that it was ignored. That happened here. You can look at the specific inner thoughts. Any risk or some percentage of risk? Well, I think that it was substantial risk, and here's why. This was new technology, and it wasn't just new technology for the sake of new technology. It's ‑‑ defendants were trying to use it to replace ‑‑ But PCR isn't new technology. It's been around for a long time. Its application to UTI testing certainly was. In fact, the gold standard for UTI testing has been around for 70 years. That's been the standard, and it's not ‑‑ That was the only until PCR came into being. I'm sorry, Your Honor? That's because until PCR came into being, that's what was available. Well, that's right, but it's also been ‑‑ it's not only an effective method of testing, but it's also significantly less expensive, $10 versus $700 for the testing. And what I will say just on the question of medical necessity, that is not a question that this court needs to address. However, I will point the court to the American Urological Association's remarks from 2019 saying that PCR UTI testing, even then, after the relevant time period, was not suitable for introduction into clinical practice, and its veracity was not tested. There is a lot of evidence that supports basically the lack of a basis for defendants to believe that this testing was medically necessary. In light of that absence of facts, then you look to what they were actually thinking, and what they were thinking was we need more guidance, but they didn't seek that guidance. So how does that add up to knowingly submitting medically unnecessary claims, right? You've either got to show actual knowledge, deliberate indifference, or acting in reckless disregard. And I think, I mean, you say your best direct evidence of this is the e-mails. Yes, Your Honor, and I think that those e-mails satisfy both deliberate ignorance or reckless disregard. Obviously, reckless disregard is a lower standard. Let's say I disagree with you. Is there any other evidence you think we should look at? Well, of their direct knowledge, no, and that makes sense. I mean, CENTER is a difficult thing to prove without, you know, the inner workings of somebody's mind is a difficult thing to prove. Here we have the insight of what they were thinking. But I would also point, again, to the other evidence that I was just referring to, the AUA's guidelines, the lack of an NCD or an LCD, the fact that, you know, my friend will say that there was contemporaneous research at the time that said that PCR UTI testing was a valid and necessary alternative. As we discuss in our reply brief and elsewhere, those studies don't actually speak to the question of medical necessity. And I think that the other point to make on this is that we were talking earlier about the purpose of Medicare. Services that are reimbursed by Medicare have to be within accepted standards of medical practice, and they can't exceed a patient's need. Medicare strikes the balance between protecting patients but also protecting taxpayer dollars. And what we have here is a type of testing which the American Neurological Association has recognized is not fit for clinical use, and we also have something that's incredibly expensive. I mean, that's the financial motivation for defendants to provide this test. It's lucrative. So taking all of that into account, I think a jury would have some real questions that it would need to address. First of all, what did Rutledge and Grizzell mean when they were having this back and forth about their duty to inform CMS of this new technology and the need to seek additional guidance? Why did defendants never seek that guidance? They identified the need to do it, but then they remained silent. What basis do they actually have for believing that PCR UTI testing was medically necessary? Now, my friend will probably point to statements by Rutledge and by others saying that PCR testing is faster, is superior. Medicare does not reimburse tests of convenience. Those are convenience tests. What Medicare looks to is, is the test accepted within the current medical standards, and does it not go further than what the patient actually needs? So to say that it might be more convenient or, quote, superior, that does not address the question of medical necessity. The only time medical necessity is actually referenced by Rutledge or by Grizzell is in the email where they identify the need to tell CMS about it. Grizzell says we should seek guidance on this exact question, and then nothing happens. Could you address Omni's conduct in this and doctors requesting the BUC and Omni's saying no, do the PCRs? Yes, Your Honor. Defendants raised the argument that Omni's owner was a superseding cause that affects the causal chain. That misstates the facts here. Omni's owner was not involved in the submission of Medicare reimbursement claims. He wasn't involved in the submission of the claims, but they say he was involved in ordering the testing. Well, Your Honor, this goes back to the point we were discussing before, which is that the actual patient-specific determination is irrelevant to the question of whether categorically PCR UTI testing is medically unnecessary. You can look to the fact that MD Labs processed other tests or other samples from other providers. We would argue that those were also medically unnecessary, regardless of the conduct that happened before those samples actually got to MD Labs. The key here is that Omni's owner was a preceding, not a superseding cause, and the district court acknowledged that during the summary judgment hearing as well. If there are no further questions. Thank you. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the record to begin? Good morning, Your Honors, and may it please the court. My name is Seth Orkand, and I appear on behalf of the appellee's MD Spine Solutions, doing businesses at MD Labs, Matthew Rutledge, and Dennis Griselge. And with me is Juliana Sharpentier. Your Honors, there is no evidence in the hundreds of thousands of pages of documents that were produced in discovery, numerous depositions, and expert opinions that the appellees subjectively believed that PCR UTI testing was medically unnecessary or that they were aware of the substantial and unjustifiable risk that it was. The appellant rests its email on just one sentence of one email that, on its face, does not say what the appellant claims it says. That email doesn't express any doubt as to the medical necessity of PCR UTI tests or acknowledge the risk that these tests were medically unnecessary. The Supreme Court in super value made clear that both deliberate ignorance and reckless disregard require a showing that the defendant was conscious of a substantial and unjustifiable risk when they submitted claims. In their statement where they say we should seek guidance, how do you interpret that? It sounds like they're on notice that something may be afoot. Yeah, Judge Thompson, I invite you to read the entire email, as I'm sure you've done, to understand the context of that statement a bit more. The appellant claims that the email recognizes the need for guidance, which it does, but even if that's an accurate interpretation of the email, it doesn't follow from a suggestion that we seek guidance, that the appellees subjectively believed that PCR UTI testing was medically unnecessary or that there was a substantial and unjustifiable risk that it was. Wanting guidance from a billing contractor does not indicate substantial concerns about the medical necessity or whether or not it was medically necessary. What does it indicate? Well, a Medicare provider might request guidance for all kinds of reasons, for example, to avoid future billing disputes or to ensure compliance with evolving standards or simply out of an abundance of caution. But the mere act of wanting guidance, Judge Thompson, without more, doesn't establish that the appellees believed that their claims were false or even that they doubted their truth. A plain reading of that email reveals no stated defect in PCR UTI testing. Instead, it reflects a conversation about pricing and billing for the test and the desire for additional guidance about a test that the appellees believed was medically necessary. Matthew Rutledge, in the initial email in that thread, states that PCR UTI testing pinpoints DNA signatures from various infectious pathogens to positively identify them with almost 99 percent certainty very quickly and relatively affordably. But why isn't a reasonable inference that they thought that there was a risk, just based upon the wording of that one sentence, that this was medically unnecessary? Two points, Your Honor. First, it doesn't say that there was a risk. The appellant was unable to find any evidence anywhere in the record where the appellees stated any concern that there was an actual risk. And for that reason, this email is a far cry from the emails that were at issue in SuperValue. So in SuperValue, there were a number of emails in which executives wrote, we have issues, or we shouldn't speak about this in writing, or they expressed knowledge that matching a price offer becomes the usual and customary price. Those emails demonstrated that SuperValue thought that their claims were inaccurate and went ahead and submitted them anyway. This email is different. It doesn't say we have issues or there's a risk that we are performing medically unnecessary testing or that we shouldn't put this in writing. The appellant's view that this is a smoking gun, Your Honor, is the type of conclusory allegation and improbable inference that is appropriately disposed of on summary judgment. And as Judge Saris noted in her decision, the appellants offered no evidence that the appellees were aware of any substantial risk at the time they submitted claims for reimbursement. So, Your Honor, left with nothing more than improbable inferences about that sentence, the appellant claims that it was so blatantly obvious that PCR UTI testing was medically unnecessary that the appellees must have known that the same was true about the PCR UTI test that they offered. And it's undisputed that the absence of a national or local coverage determination for PCR UTI testing during the relevant period doesn't establish the enter because, as the district court noted, in the absence of an NCD or LCD, the Medicare contractor makes case-by-case determinations based on the individual's particular factual situation, just like physicians who ordered those tests do. All that the appellant can show from the record is that a medical society in 2019, post-dating the conducted issue here, wanted more evidence to be certain that doctors would use PCR UTI tests appropriately, given the increased specificity and accuracy of those tests. That's a different question than whether the test was medically necessary for any particular patient. The appellant cites no one in any year who affirmatively told the appellants that PCR UTI testing was categorically medically unnecessary. All they cite is the uninformed lay opinion of Dr. Craig Deligdish, the owner of Omni, who couldn't cite a single study or authoritative source as the basis for his opinion in his deposition. In Exhibit 3, the Matthew Rutledge Declaration, he says that contemporaneous research indicates the superiority of PCR UTI testing. Was that contemporaneous research ever identified in the discovery? It was. So we cite four studies in particular that date back to 2010 that discuss the accuracy and benefits of PCR testing, as opposed to the 70-year-old technology of bacterial urine cultures. And so my follow-up was, did MD labs know about? There's no evidence in the record about whether they knew it, other than whether they knew of those specific studies, other than Mr. Rutledge testifying in his deposition and stating in his declaration that the lab was aware of contemporaneous research at the time. And I will say that there are promotional materials in the record from MD labs that cite specific medical studies about some of the issues with bacterial urine cultures and false negatives. So I think you can infer from that that there was some knowledge at MD labs of contemporaneous research at the time. Now, certainly the research developed over time, and it has become quite clear in recent years, using data from that time period, that PCR UTI testing is more accurate and has fewer false negatives than bacterial urine cultures. The experts here do not dispute that PCR UTI testing can be medically necessary for certain patients. The appellant's own expert admitted as such and described a variety of situations in which PCR UTI testing is medically appropriate. And the appellee's medical expert testified as well about a number of reasons that PCR UTI testing can be medically necessary. So there's no dispute there that PCR UTI testing is not categorically medically unnecessary. It's the role of the individual physician to determine the medical necessity of the tests that she or he orders for any particular patient, based on that patient's medical record, history, symptoms, other testing, and that sort of thing. Judge Thompson, you asked a question of my friend earlier about what is a lab supposed to do. And I think that you're hitting the nail on the head. It's not the role of the lab to second-guess the medical necessity determination of a physician. Labs do not treat patients. They don't have patients' medical records, historical medical records. And so they can't. HHS guidance makes clear that laboratories do not and cannot treat patients or make medical necessity determinations. This case is unlike one of the cases that both parties cite. It's a Lear-Ho monitoring, which found that the defendant was on notice that certain tests were medically unnecessary because the relator in that case told them that, and they were actually on notice. But here, as I said, the appellant is unable to find any document that suggests that the appellees were on notice. Instead, the uncontroverted evidence demonstrates the opposite, that the relator certified to MD labs that the tests were medically necessary while hiding the facts that would have put the appellees on notice that those tests were not medically necessary. So the appellant seems to be suggesting that there's an independent obligation on the labs to do that kind of assessment for Medicare purposes. And there is, Your Honor. Labs, as the billing provider, have a duty to ensure that they're not submitting medically unnecessary, not submitting false claims for medically unnecessary tests. So how do you reconcile that with a doctor has a prescription but there's an independent duty? How do you work out that tension? Well, the case law is clear, Your Honor, that laboratories are entitled to rely on the medical necessity determinations of the providers. That was the holding in a number of the cases that are cited in our brief. What labs have to do is, first of all, ensure that medical providers certify that the tests are medically necessary, which MD labs did here on this requisition form, and to determine that it's billing the Medicare contractor appropriately, using the appropriate modifiers, for example, the appropriate billing codes, et cetera. So that's the role of the lab. That's the duty of the lab to ensure that they're not submitting false claims. And I would say, Your Honor, that laboratories, if they follow OIG guidance, might also sample specific requisition forms to ensure that physicians have actually made those medical necessity determinations. Counsel, if I may. Yes. Your opponent keeps trying to recharacterize this case as about categorical characterization of these tests as medically unnecessary. But as both of my colleagues have said, the law is clear. You can rely on the doctor's determination. And that is individual as to each patient. So I hear on the record, putting aside the legal issue of superseding cause, I believe that there was a doctor's certification for every one of the PCR tests at issue, which were billed to Medicare, Medicaid. So how is it accurate to portray this as a categorical case? It's not accurate, Judge Lynch. Medical necessity is determined on a case-by-case basis by a physician for a specific patient, based on that patient's medical history, symptoms, other test results. Partly I'm worried because one does want the testing to be geared to the specific patient. And if courts go adopting categorical rules on the basis of facts like this, we might well undermine the importance of the individual determination. I absolutely agree, Judge Lynch. If this court or any court were to make determinations based on the categorical medical necessity of any particular test, it would essentially be tying physicians' hands to make their own decisions about what's medically necessary for their patients. And I might add, Judge Lynch, that there actually is no dispute that PCR UTI testing renders faster results and is more accurate than traditional bacterial urine cultures. Counsel, you're talking to a panel of three female judges. I understand that, Your Honor. Point made. Thank you. And, you know, if anyone who has had a urinary tract infection would tell you that faster testing is not a matter of convenience. It's a matter of patient safety. The record is clear that urinary tract infection. As I said, point made. Thank you, Your Honor. Appreciate it. Judge Lynch sort of articulated what I think the three of us were thinking. But on another note, I'm still trying to figure out what to make of Dr. Deladish's conduct in this. I don't know how to even frame what he did and how his intervention in this impacts our analysis. Yeah. Well, Judge Saris found Dr. Deladish's conduct extremely troubling, as do we. He, for 600 times, usurped the patient's provider's decision about what test to order and directed staff at the practice to change that order and submit a PCR UTI test order to MD Labs. The appellant's theory below was that MD Labs sales representatives went out, spoke with physicians, and convinced them to order medically unnecessary tests through their marketing materials. Well, in this case, that was not true. And the only claims, the only tests that the appellant conducted discovery on were its own tests. There's no evidence in the record about any other provider's medical necessity determinations. And so here, regardless of what any MD Lab sales representative said, Dr. Deladish intervened and changed those test orders to a test that he knew was medically unnecessary, certifying that it was medically necessary and hiding what he did from MD Labs. So that's why we say it's an intervening or superseding cause. But regardless, MD Labs' representations through its sales representatives were not the but-for causation of the false claims. It was Dr. Deladish's intervention that was the but-for causation. And so on that basis, we believe that you can affirm the decision below as well. Thank you. Your time is up. Thank you, Your Honors. Thank you, Counsel. At this time, would Counsel to the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Your Honors, Evan Bianchi on behalf of Omni. Your Honors, I think it's important to remember that the request that we're asking here is very narrow. We are not asking this court to make a determination on medical necessity. And, in fact, I think it would be improper for this court to do so. The record on appeal is not fulsome. The district court did not address the issue. And it's my understanding that on remand, my client would seek to narrowly expand discovery to introduce recently obtained statements from some of the medical contractors about the medical necessity or the lack thereof of these tests. I do not think it's an appropriate decision for this court to make at this time without the benefit of the district court having weighed all the evidence fully and made a determination one way or another on it. I do think that there's the issue that's come up about, well, what should the lab do or what shouldn't the lab do if they get something that's certified by a physician? Now, I know factually there's some instances here where certain requisition forms may not have been properly completed by physicians. Putting that to the side. Well, I mean, that's important because on the issue of Sienter, you know, they get a request from a physician. But you're saying that they should have known that it was medically unnecessary despite the fact that a physician ordered the testing. So that goes to the Sienter issue that you're arguing. Absolutely, Your Honor. But I think what makes this case different is that there is evidence that that Sienter existed for these particular defendants. At the time they were beginning to roll out this testing, they identified the need to seek additional guidance, and they didn't do so. This is not a case where the laboratory is silent and there's no reason to suspect that the laboratory has any doubts as to whether or not the services it's offering are medically necessary. Here you have the founders identifying an issue. And I think it's telling that we're arguing about the interpretation of an email and what could the founders have meant when they were saying it. That is exactly the type of question that a jury can weigh in on and should weigh in on. It's a matter of credibility, intent. And again, what's also important here is that this is new technology. This is not technology that's been around for a long time that CMS or any of the Medicare contractors have determined is medically necessary. In fact, it's during the relevant time period that that was definitely not the case. And what MD Labs did was sought out physicians to use its services, to use PCR services. So while it was on one hand seeking out new physicians to generate business for them, it was on the other hand doubting or at least recognizing and then disregarding the risk that these services may not even be medically necessary in the first place. That's the question that's on appeal here. It's a question of scienter, what they were thinking. And on that issue, we would say that should go to a jury and this court should send the case back down to the district court for a determination of medical necessity. If there are no further questions. Thank you, Your Honors. Thank you. That concludes argument in this case.